[Cite as *Cook v. Kramer*, 2022-Ohio-3422.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
JEFFERSON COUNTY

ROBERT COOK,

Plaintiff-Appellee,

v.

JULIA KRAMER fka COOK,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 21 JE 0026**

---

Civil Appeal from the
Court of Common Pleas of Jefferson County, Ohio
Case No. 18 DR 348

**BEFORE:**
Cheryl L. Waite, Gene Donofrio, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Reversed.
Judgment Entered in favor of Appellant.

---

*Atty. Francesca T. Carinci*, Carinci Law Office, 100 North Fourth Street, Suite 904-911, Sinclair Building, Steubenville, Ohio 43952, for Plaintiff-Appellee

*Atty. Elgine Heceta McArdle*, McArdle Law Office, 2139 Market Street, Wheeling, West Virginia 26003, for Defendant-Appellant.

Dated: September 20, 2022

**WAITE, J.**

{¶1} Appellant Julia Kramer (formally known as Julia Cook) appeals a September 20, 2021 judgment entry of the Jefferson County Court of Common Pleas granting Appellee Robert Cook's motion for reallocation of parental rights. Appellant argues that each of the professional witnesses at the hearing opined that the custody arrangement should not change based on the sole incident at issue. Appellant also argues that the court improperly relied on outside knowledge when rendering its decision in this matter. For the reasons provided, Appellant's arguments have merit and the judgment of the trial court is reversed and judgment is entered in favor of Appellant.

Factual and Procedural History

{¶2} The parties divorced after approximately two years of marriage. The marriage produced one child ("the Child") who was born on July 18, 2018 and at the time of the instant proceedings was approximately twenty months old. Appellee announced his intent to seek a divorce when the Child was approximately thirteen weeks old. Because the divorce itself is not at issue, it will not be addressed at length. At issue is the trial court's change as to the residential parent of the Child. Certain aspects of the divorce relevant to only this issue will be briefly addressed.

{¶3} During the divorce proceedings, both parties sought to become named as the Child's residential parent. At one point, Appellee sought sole custody, however, he abandoned his attempts and later allowed Appellant to serve as residential parent.

{¶4} On March 19, 2020, Appellee filed a motion for contempt/motion for reallocation of parental rights/motion and an ex parte order to resume parenting time.

Appellee also filed a motion seeking reimbursement of medical costs. At the time these motions were filed, the divorce decree designating Appellant as residential parent had not yet been signed due to certain issues outside of the control of the parties. The decree was not formally entered until four days later, on March 23, 2020.

{¶5} The ex parte motion was based on Appellant temporarily withholding parenting time from Appellee after an incident where the Child received injuries while in the care of Appellee and his family, as later discussed. Appellant made the decision to temporarily withhold parenting time based on counsel's advice. The court granted the ex parte motion to resume parenting time.

{¶6} Appellee filed numerous additional motions in this matter which were all voluntarily dismissed at different stages. It does not appear that any of these were custody related motions. After Appellee dismissed his various motions, the sole remaining issue before the trial court was his motion for reallocation of parental rights. The court held a three-day hearing on this motion where the following witnesses testified: Appellant, Appellee, Appellee's mother and father, Sgt. Wes Crawford (Steubenville Police Department), Chief Deputy Susan Bell (Jefferson County Sheriff's Department), Glenda Jones (Jefferson County Children's Services), Michelle Santin (Jefferson County Children's Services), JoAnne Mulrooney, Guardian Ad Litem Craig Allen, Dr. Philip Nawrocki, and Dr. Edward Baker.

{¶7} While both parties presented evidence regarding their numerous disagreements and grievances, Appellee's motion was based on one specific incident. That incident occurred on March 16, 2020 when Appellee's father was to return the Child to Appellant following visitation. Appellee's father brought the Child to the parking lot of

a Bob Evans Restaurant located in Steubenville where Appellant was waiting to pick up the Child. When Appellant placed the Child in his car seat, she noticed a long, dark red line across the Child's upper neck. Appellee's father had already left the parking lot, but Appellant was concerned about this injury and sent a text message to Appellee asking what had happened to the Child's neck. Appellee immediately responded to her text but did not acknowledge or attempt to answer her question. Instead, he asked Appellant if he would get the Child the next day, which was not his scheduled day according to the custody agreement.

{¶8} Receiving no explanation and concerned about a possible neck injury, Appellant called emergency services but could not remember if she called 911 or the police department. (Trial Tr., p. 614.) Sgt. Crawford arrived at the parking lot and examined the Child. Sgt. Crawford did not believe that the injury was serious but told Appellant that it would "not be a bad idea" to get him checked medically. He told Appellant that she could follow up with Det. Jarvis of the juvenile division.

{¶9} According to Appellant's testimony, she followed Sgt. Crawford's advice and sought medical services. She first took the Child to a medical clinic called "MedExpress." The Child was examined by Chad Bauman (also called Bowman in the record) who opined that the Child should be taken to an emergency room. Appellant testified that she did not want to overreact, so she took the Child to her friend, JoAnne Mulrooney. Mulrooney was described by both parties as a highly respected local nurse who had recently retired.

{¶10} Mulrooney testified that she noticed the neck injury before Appellant even began talking and was immediately concerned that the injury, which she described as

similar to a "ligature mark," could pose harm to the Child either immediately or in the future. (Trial Tr., p. 87.) Mulrooney was also concerned because there was a significant amount of dried mucus in the Child's nose and on his cheeks and a significant amount of dog hair matted in the mucus and sticking out of the Child's pacifier. Mulrooney also believed the Child should be seen at an emergency room and called her friend, Dr. John Columbus, to ask his opinion. Dr. Columbus, who is an attending physician at Trinity Hospital, recommended that Appellant bring the Child to the emergency room.

{¶11} Based on Dr. Columbus' advice, Appellant took the Child to Trinity Hospital Emergency Room. While at Trinity, Dr. Columbus did not examine or interact with the Child. Instead, a resident named Dr. Lee Gillespie and a supervising physician named Dr. Nawrocki conducted the examination. There is no evidence that Dr. Columbus spoke to either attending physician at any point and there is no evidence that Appellant previously knew either emergency room physician.

{¶12} Dr. Nawrocki testified that he and Dr. Gillespie made the decision to transfer the Child to the University of Pittsburgh Medical Center ("UPMC") "due to concern for possible blunt vasculature." (Trial Tr., p. 433.) Dr. Nawrocki specifically denied that Appellant influenced his decision in any way and insisted that his decision was based on the "potential for serious injury, given the injury pattern, that was the reason they were referred." (Trial Tr., p. 442.) He further expressed his concern that "that's just not an injury -- an accidental injury pattern that I have ever seen or that I've heard of in a one-year-old." (Trial Tr., p. 447.)

{¶13} At the direction of Dr. Nawrocki, the Child was taken by ambulance to UPMC. Appellant had asked to take the Child herself, but was informed that he needed

to be transported by ambulance due to concerns that the injury may affect his airway. Appellant also was not permitted to accompany the Child in the ambulance and had to follow behind in her vehicle.

{¶14} None of the medical providers from UPMC testified, however, these medical records were admitted into evidence. A UPMC report provided the diagnosis which was a "superficial linear abrasion across anterior neck." (Plaintiff's Exh. 10.) A medical document from UPMC noted that the abrasion measured between 6-8 cm (2.382 inches-3.15 inches). The report also noted that the depth of the "punctate" was 1mm. The report noted there were two smaller red abrasions underneath the main abrasion and abrasions to the Child's knuckles.

{¶15} These reports make reference to claims of prior domestic abuse involving Appellant and Appellee. The record is somewhat unclear as to this reference, but Appellant testified at the hearing that she clarified to UPMC that the alleged domestic abuse was "not physical." (Trial Tr., p. 675.)

{¶16} UPMC did not release the Child until the early hours of the next morning, so Appellant did not arrive back home until approximately 6:00 a.m. (Trial Tr., pp. 675-676.) As a result, Appellee did not get visitation with the Child on that day as he had wished. The record contains evidence that the parties texted back and forth. Appellee did not inform Appellant whether he knew the cause of the injury but downplayed its seriousness, referring to the injury as mere "scratches." Appellant then informed Appellee that he would not see the Child until some explanation for the cause of the injury was provided, based on advice from her attorney. The record reflects that UPMC reported the Child's injury to authorities for investigation based on the potential for child abuse.

**{¶17}** Appellant's counsel sent Appellee's counsel a letter stating: "When my client picked [the Child] up from visitation with his father on March 16th, 2020, she discovered injuries that were not there when she dropped him off. She has attempted to get an explanation from [Appellee] but he has refused to explain how the injuries occurred. Please obtain an explanation from your client as this would greatly assist in decisions made going forward." (Def. Exh. 2.) Appellee's counsel did not respond to this letter, opting instead to file a motion for reallocation of parental rights and seeking an ex parte order restoring parenting time.

**{¶18}** On September 20, 2021, the trial court issued a judgment entry granting Appellee's motion for reallocation. It is from this entry that Appellant timely appeals.

ASSIGNMENT OF ERROR NO. 1

The evidence presented at trial was insufficient to warrant a modification of custody.

ASSIGNMENT OF ERROR NO. 2

The court improperly substituted its own personal knowledge, outside of the evidence presented at trial, to issue a ruling on the merits of the case.

**{¶19}** In Appellant's first assignment of error, she argues that the evidence presented at the hearing did not warrant a change in the designation of residential parent. Appellant argues that she withheld parenting time for only a limited period while awaiting a response from Appellee's counsel. Appellant points out that Appellee himself acknowledged that she had never withheld parenting time on any other occasion and had

never made an allegation of abuse against him. Appellant urges that each medical facility believed the Child should receive further medical attention based on the injury pattern and the lack of explanation regarding the cause and that she merely followed the medical advice given to her throughout the process. Appellant explains that it was UPMC that reported an incident of potential abuse to Children's Services.

{¶20} In her second assignment of error, Appellant contends that the court improperly considered its personal knowledge of her former employment as a local news reporter and construed this as evidence that Appellant somehow knew that her actions would cause a child abuse investigation to be instituted against Appellee and that she used this knowledge to actually and improperly cause such an investigation.

{¶21} In response to the first assignment of error, Appellee focuses his argument on the deference afforded to a trial court. As to the second assignment of error, Appellee asserts that the record demonstrates Appellant was formally a local news reporter and it is "generally known what reporters do for a living." (Appellee's Brf., p. 14.)

{¶22} If a trial court's decision regarding the custody of a child is supported by competent and credible evidence, it will not be reversed absent an abuse of discretion. *Bechtol v. Bechtol*, 49 Ohio St.3d 21, 550 N.E.2d 178 (1990), syllabus; *Rohrbaugh v. Rohrbaugh*, 136 Ohio App.3d 599, 603, 737 N.E.2d 551 (7th Dist. 2000).

{¶23} A trial court has broad discretionary powers in child custody proceedings, and a reviewing court should give the trial court's decision a great deal of respect in light of the gravity of the proceedings and the impact that a custody determination has on the parties involved. *Reynolds v. Goll*, 75 Ohio St.3d 121, 124, 661 N.E.2d 1008 (1996); *Trickey v. Trickey*, 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952). R.C. 3109.04 provides a

guide to a trial court's use of discretion during a custody modification proceeding. *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988).

{¶24} Pursuant to R.C. 3109.04(E)(1)(a):

The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:

* * *

(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.

{¶25} When determining a child's best interest, the court shall consider all relevant factors, including:

(a) The wishes of the child's parents regarding the child's care;

(b)  If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c)  The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d)  The child's adjustment to the child's home, school, and community;

(e)  The mental and physical health of all persons involved in the situation;

(f)  The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g)  Whether either parent has failed to make all child support payments, including all arrearages that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h)  Whether either parent or any member of the household of either parent previously has [ever been convicted of certain offenses or had a child adjudicated abused or neglected];

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

Case No. 21 JE 0026

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

R.C. 3109.04(F).

{¶26} Again, the sole incident relevant to this proceeding involves the injury to the Child's neck. While Appellee argues that this action also involved issues he raised in a contempt motion, those claims were voluntarily dismissed, thus any allegations raised in that motion may not be considered. We note that both parties introduced evidence of various altercations, arguments, and disagreements between them, most of which are not new to the parties. The record shows that these parties have a long and contentious history, with instances of name-calling and bad behavior on the part of both Appellee and Appellant. Regardless, this evidence is also not relevant, as the motion for reallocation of parental rights was limited to the incident beginning with the injury to the Child's neck. In any event, this extraneous evidence reveals what is abundantly obvious: the parties do not have an amicable relationship and do not effectively communicate.

{¶27} Our analysis is driven solely by the following question: were Appellant's actions as they relate to the incident involving the Child's injury sufficient to demonstrate a change in circumstances? This record reflects no such change in circumstances.

{¶28} The timeline of the events regarding the incident is critical to this analysis. The incident began when Appellee's father delivered the Child to Appellant following Appellee's visitation. Appellee's father claimed at the hearing that the Child was clean and had no visible signs of injury on his body at the time of the exchange. However, a photograph of the Child that Appellant texted to Appellee only moments after this exchange reveals a dark red abrasion across more than half the length of the Child's

upper neck, with smaller abrasions branching off of it. This photograph was admitted into evidence.

**{¶29}** Contrary to Appellee's assertion at oral argument, the photograph also depicts a significant amount of dried mucus, which almost completely plugged the Child's nose, underneath his nose, and on his cheeks. Small hairs that appear to be dog hair were matted in the mucus and were also sticking out of the Child's pacifier, which was inside his mouth. Apparently, Appellee has a K9 dog and trains other dogs as a side business.

**{¶30}** Despite Appellee's father's testimony, based on the time the Child was returned to Appellant and the time of her photo and text, these injuries could not have been suffered in the moments between the exchange and Appellant's text message to Appellee. The Child is not in any apparent distress in the photograph, as would be expected with a Child who had just received an abrasion across his neck. Further, the mucus was dried and the dog hair was matted within the mucus, making it impossible for Appellant to have caused this state. Whether Appellee's father knew of the abrasion or had seen it before returning the Child to Appellant, the record reveals the Child was returned to Appellant with an obvious injury and unclean.

**{¶31}** The photograph depicts what a reasonable person would describe as an injury to a delicate area of the body, and troubling conditions are seen on the mouth and nose area of the Child. The parties agree the Child suffers from asthma. While the trial court's judgment entry states that it is unclear whether the Child has asthma, both parties clearly testified that he has been diagnosed with asthma, receives breathing treatments,

– 13 –

and has an inhaler at both residences. This fact was also established during the underlying divorce proceedings.

**{¶32}** Appellant texted Appellee and requested an explanation of the cause of the injury. Appellee testified he refused to respond to Appellant's request because he claimed that any response by him would have triggered an argument. It is clear that Appellant was concerned by the injury and her concerns are validated by the photo. While Appellant could have been more cordial in her text, she requested that Appellee explain the origin or at least tell her that he did not know how the injury occurred. Instead, he ignored Appellant's request and responded by asking if he would get visitation with the Child the next day, a day that he was apparently expected but not scheduled.

**{¶33}** Receiving no answer, Appellant then called emergency services. Although the trial court's judgment entry specified that Appellant called 911, she testified that she could not remember if she called 911 or the Sheriff's Department. (Trial Tr., p. 614.) Regardless, Sgt. Wes Crawford arrived and examined the Child. Sgt. Crawford, who is not a medical provider, determined that the Child's injury did not appear serious to him but advised Appellant that she might want to have the Child medically examined.

**{¶34}** Appellant testified that she sought the least invasive treatment possible, so she took the Child to a local clinic called "MedExpress." Chad Bauman (aka Chad Bowman) advised Appellant to take the Child to the emergency room. This recommendation came from a medical provider and constituted medical advice. Inexplicably, the trial court's judgment entry refers to Bauman as a friend of Appellant and states that the two used to be co-workers. Neither of these assertions are supported by

Case No. 21 JE 0026

the record. There is nothing within this record to suggest that Appellant and Bauman were even acquainted prior to this incident.

**{¶35}** There is also nothing within the record to suggest that Appellant accused Appellee of child abuse or that she even uttered that phrase to Bauman. The record shows that she informed Bauman she had texted Appellee to ask what had happened and he refused to respond. Again, the Child's main injury was an abrasion on his neck between two and one-half to three inches long. It is not unreasonable for a medical provider to ask a parent how the Child received such an injury. Appellant's assertion that Appellee failed to respond to her is factually correct, as Appellee admits. Appellant cannot be faulted for honestly providing information related to medical treatment, particularly as it appears Appellee may have avoided this specific situation by simply explaining the cause of the injury.

**{¶36}** Appellant testified that in an effort not to overreact, she took the Child to Mulrooney's house instead of directly to the emergency room. Again, Mulrooney is described by both parties as a well-respected former nurse. Mulrooney testified that the abrasion caught her attention immediately, even before Appellant mentioned it. She described her observations, stating the Child "had a red mark from -- around the base on his neck (indicating). It was a red line around the base of his neck she was concerned – and I think I at the time, I was concerned – about. I knew he had asthma." (Trial Tr., p. 81.) She continued, "[a]nd I was worried about what was going on here (indicating). I didn't know about what happened around his neck." (Trial Tr., pp. 81-82.) Mulrooney continued "I don't know what could have caused that. It almost looks like a ligature mark, but it's a red mark around his neck." (Trial Tr., p. 87.) She stated on cross, "I was

concerned about his asthma, not knowing what all this was, and did that trigger an asthma attack that would trigger something a little more desperate down the line." (Trial Tr., p. 86.)

**{¶37}** Because of her concerns and Appellant's reluctance to take the Child to the emergency room, Mulrooney called her friend, Dr. Columbus. Again, Dr. Columbus is an emergency room physician at Trinity Hospital. Dr. Columbus opined that the Child should be transported to the emergency room. Hence, Appellant took the Child to emergency based on medical advice.

**{¶38}** At Trinity, resident Dr. Gillespie and supervising physician Dr. Nawrocki examined the Child. Dr. Nawrocki testified that it was he who made the decision to transfer the Child by ambulance to UPMC "due to concern for possible blunt vasculature." (Trial Tr., p. 433.) Dr. Nawrocki specifically denied that Appellant influenced his decision in any way and insisted that his decision was based on the "potential for serious injury, given the injury pattern, that was the reason they were referred." (Trial Tr., p. 442.) He further expressed his concern that "that's just not an injury -- an accidental injury pattern that I have ever seen or that I've heard of in a one-year-old." (Trial Tr., p. 447.) In its judgment entry, the trial court dismissed Dr. Nawrocki's testimony as not credible. While this determination is certainly within the purview of the trial court, the court apparently makes the leap that Appellant should not have relied on the doctor's medical advice, even though the record is absent an indication that Appellant had reason to be aware she should not rely on the advice of this medical professional.

**{¶39}** At Dr. Nawrocki's direction, the Child was taken by ambulance to UPMC. She was also not permitted to take the Child herself and was not permitted to accompany

the Child in the ambulance. While the trial court also criticized Appellant for allowing the Child to be transported by ambulance, Appellee himself admitted that Appellant was merely following medical advice. His counsel stated the following at the hearing:

> [Appellee's counsel]: I will tell you, too -- I have to say, based on the evidence, I don't think that the medical bills are unreasonable. *Because I think that quack from Trinity caused it to be, so I don't think the ambulance -- after hearing him, I don't think it was her fault about the ambulance.* So I think the medical bills are reasonable.
>
> Like he'll -- he's saying he even agrees with me. (Emphasis added.)

(Trial Tr., pp. 482-483.)

{¶40} Again, none of the medical providers from UPMC testified. The medical records were admitted into evidence. These contain a diagnosis of "superficial linear abrasion across anterior neck." (Plaintiff's Exh. 10.) The abrasion was roughly two to three inches in length and 1mm deep. The Child also had two smaller red abrasions underneath the main abrasion and abrasions to the knuckles.

{¶41} UPMC made the decision to alert Jefferson County Children's Services ("Children's Services"). Appellant testified that she called Children's Services the next morning after being informed by UPMC staff that their report would be submitted overnight. UPMC documents indicate that a message had been left at the agency, which was closed at that hour, concerning UPMC's report. Appellant testified that she called the agency to check the status because she was informed that she may be required to call them.

Case No. 21 JE 0026

{¶42} Dr. Baker, who performed psychological examinations of both parties, testified regarding Appellant's call to Children's Services and opined that "[i]t's certainly the normal process that once the medical evaluation is done, and then if there's some conclusion that there's some uncertainty about the nature or the cause of the investigation, that that typically happens in that order." (Trial Tr., p. 581.)

{¶43} Although the trial court clearly holds Appellant responsible for the investigation into possible abuse, the UPMC documents clearly state that "[s]ocial work filed childline in Ohio *based on injuries without explanation.*" (Emphasis added.) (Plaintiff's Exh. 10.) Thus, it was not Appellant who triggered the child abuse investigation. Rather, the decision to report the abuse to Children's Services was prompted by concern from the Child's medical providers as a result of the unusual appearance of the abrasion and lack of an explanation of the cause of this injury. The trial court clearly faults Appellant for following the advice of the medical providers and suggests she "manipulated" the entire situation in order to cause an investigation into possible child abuse. This record does not support such a conclusion, however.

{¶44} In addition to dismissing the opinion of the attending physician as incredible, the court also dismissed the testimony and opinions of Dr. Baker, the physician who undertook psychological examinations of both Appellee and Appellant. Dr. Baker testified that he did not see any benefit to changing the residential parent and stated his belief that "I don't think a specific custody arrangement would resolve that, even if -- unless one parent had no custody whatsoever and didn't see the child, which I don't think would be appropriate in this case. So even if a parent had every-other weekend or some modification such as that, there's still ample opportunity for that conflict to occur." (Trial

Tr., pp. 534-535.) Dr. Baker emphasized his belief that the parties equally contributed to the communication issues and animosity.

**{¶45}** As to the specific incident at issue, Dr. Baker opined that Appellee's deliberate lack of communication caused an overreaction by Appellant. Dr. Baker provided testimony that, in hindsight, it appears that the injury was not serious and that it was possible mother engaged in "overexaggeration." (Trial Tr., p. 546.) However, he clearly asserted that this opinion was based on the benefit of hindsight. He testified that a medical evaluation of the Child "seemed like a reasonable thing to do if there was some concern about, you know, further injury." (Trial Tr., p. 578.) He also testified that the multiple evaluations by various providers to whom Appellant was directed were not an overreaction based on the circumstances and "[i]f she didn't do it, that would be seen as being irresponsible based on the doctor's recommendation." (Trial Tr., p. 579.)

**{¶46}** Dr. Baker further opined that the parties' conflict is centered on their differing opinions regarding how best to raise the Child and that the parties do not necessarily hate one other. He stated that both parties are guarded and provide limited information to one another, but are equally capable of parenting the Child. He opined that Appellant is "just tired of the constant legal battle." (Trial Tr., p. 587.)

**{¶47}** The court discounted Dr. Baker's testimony, finding:

[H]is conclusions were less than helpful given the entirety of the evidence in this matter. Although the Court appreciates that there are worse co-parenting relationships than the Parties here, it is not convinced of the [sic] Dr. Baker's conclusions regarding custody. This Court, having more than just an hour contact with both Parties believes that the insidious, escalating

manipulative behavior by [Appellant] has a negative effect on the development of the healthy relationship of the child with both parents. Parental alienation does not occur in an all or nothing environment. The psychological manipulation and indoctrination of a child against the other parent may begin ever so subtly and increasingly permeate the relationship of the target parent.

(9/20/21 J.E., ¶ 32.)

{¶48} This record reflects that the court's decision is at odds with not only Dr. Baker's recommendation based on his psychological exams, but also that of the guardian ad litem. The guardian ad litem likewise testified that the medical process continued to escalate because of doctor's orders rather than Appellant's actions, and that Appellee's refusal to explain the injury "served to heighten the animosity" between the parties. (Trial Tr., p. 154.) He opined that Appellant did not take the Child to the hospital with ill intent towards Appellee. However, because Appellee and his family refused to explain an "innocent" cause of the injury, this failure "served to heighten the animosity between [Appellee] and [Appellant] and his family." (1/25/21 Guardian Ad Litem Report, p. 3.)

{¶49} The guardian ad litem noted that neither party trusts the other, and that the significant amount of legal filings contribute to this distrust. He opined that both parties were equally at fault in causing this environment of distrust and a change in custody would not be productive. (1/25/21 Guardian Ad Litem Report.) He believed that both sides would continue in their questionable behavior to one another regardless of who is named the residential parent. He testified that his observations were similar to the previous guardian ad litem, who was apparently appointed in the divorce proceedings. The fact

that the recommendation of maintaining the status quo was made by both of the professional witnesses, Dr. Baker and the guardian ad litem, is significant, but completely rejected by the trial court.

**{¶50}** Appellee attempts to argue that he missed three days of parental visitation with the Child due to Appellant's actions. It is important to review the timeline of events when considering this argument. The abrasion was discovered by Appellant on Monday, March 16, 2020. The Child's medical treatment continued until the morning of Tuesday, March 17, 2020 when UPMC released the Child.

**{¶51}** Appellee claims he was entitled to visitation on Tuesday, March 17, 2020. Appellee conceded that he does not ordinarily receive the Child on Tuesdays but assumed he would this particular Tuesday because the daycare was closed and Appellant was scheduled to work. Again, this was not Appellee's scheduled day and Appellant was not obligated to give him the Child. Also, Appellant testified at length that UPMC did not release the Child until the early hours of Tuesday morning. Due to exhaustion, Appellant chose to stay home with the Child that day. At some point that morning, Appellant and Appellee texted and she informed him that he would not get the Child that day due to the hour of the Child's release and the lack of sleep. She chose to stay home from work that day, so the fact that the daycare was closed is irrelevant.

**{¶52}** It appears that Appellee was scheduled to visit with the Child on Wednesday, March 18, 2020 but did not. Hence, he missed one day of visitation. The record is unclear whether the custody agreement provided that Thursday, March 19, 2020 was Appellee's day with the Child. However, he testified "and then Thursday was an agreement between her and I that I was getting him on those Thursdays." (Trial Tr., p.

171.) It appears there was only an informal agreement between the parties and this was not Appellee's scheduled day with the Child pursuant to the custody agreement. On that day, Appellee filed his ex parte motion and he received parenting time with the Child the next day. Thus, while Appellant certainly did not intend to allow parenting time by Appellee on advice of counsel until she received his explanation, she immediately complied with the court's order. (Trial Tr., p. 639.) The record supports that Appellee lost only one of his scheduled days as provided by the court approved custody agreement.

{¶53} Appellee makes much of the fact that he was subjected to an investigation into possible child abuse by his peers which angered and embarrassed him. First and foremost, we must emphasize that Appellant did not file any kind of child abuse complaint. She did call the police once Appellee failed to answer her question about the cause of the Child's injury, but there is no evidence that she accused Appellee of abuse during this encounter. Sgt. Crawford testified that he instructed Appellant to follow up with Det. Jarvis. Children's Services had explained she could call the Sheriff's Department with any questions, and it appears she did call the Department with a question. However, there is no evidence that Appellant took any further actions with law enforcement and there is no evidence that she even mentioned the possibility of abuse. Additionally, as already discussed, it was UPMC who filed the report with Children's Services, not Appellant.

{¶54} At oral argument, Appellee complained that Appellant's actions also caused him to be investigated by the Ohio Attorney General's Office. However, the record reveals that the matter was referred to the attorney general's office only after the Jefferson County Prosecutor's Office deemed a potential conflict of interest existed and they decided to

contact the attorney general. Appellant was not involved in any way with this decision. Contrary to Appellee's argument, the fact that the child abuse investigation reached the level of the attorney general's office does not constitute a changed circumstance.

**{¶55}** Despite the fact that this incident of March 16, 2020 comprised the sole basis for Appellee's motion for a change in custody, the court relied on several other incidents not relevant to this motion in reaching its decision. Additionally, it appears that the trial court misremembered several facts that are in the record on which it heavily relied in entering its judgment.

**{¶56}** In paragraph eight of the trial court's findings, the court noted Appellee's testimony that Appellant's older child no longer speaks to his father due to Appellant's alleged alienation and expresses concern this will happen with Appellee's child. First, Appellee's step-child's relationship with his father is clearly irrelevant, here. And while Appellant admitted that there were initially communication issues with her first husband, her unrebutted testimony was that those issues have been resolved and they currently co-parent the older child without issue. Any conflicting testimony from Appellee would clearly be outside of his personal knowledge, as he provided no information leading to the conclusion that he knew of the current status of the relationship between Appellant and her first husband or of the relationship the first husband has with the former step-child. We also note UPMC's records revealed Appellant's older child was with his father in accordance with their custody agreement at the time of the hospital visit.

**{¶57}** In paragraph ten, the court found Sgt. Crawford to be "quite credible" but then inaccurately described his testimony. According to the court, Sgt. Crawford "testified that he does not know [Appellee] well as they are on different schedules." (9/20/21 J.E.,

¶ 10.) Sgt. Crawford testified, however, "I would consider him a friend, as far as we're coworkers that get along. But outside of work, I don't believe we've ever socialized." (Trial Tr., p. 13.) He also confirmed that he interacts with Appellee at work. While Sgt. Crawford testified that he does not think he has socialized with Appellee, the description provided by Sgt. Crawford in no way supports the court's conclusion that the two men do not know each other well or that they work different schedules. Sgt. Crawford did not claim that he was on a different schedule than Appellee. In fact, the record demonstrates that Appellee and Sgt. Crawford were both on shift on the day of the incident.

{¶58} In paragraph eleven, the court stated that Appellant "knew [Chad] Bowman personally and from her employment at Trinity. Mr. Bowman did not examine the child." (9/20/21 J.E., ¶ 11.) The record is completely devoid of any evidence to support any of those conclusions.

{¶59} In paragraph thirteen, the trial court stated that Appellant presented "misleading information" and implied to various health care personnel that Appellee was abusive to the Child. (9/20/21 J.E., ¶ 13.) This also is unsupported by the record. All of the evidence supports that when Appellant arrived at each medical center, she informed personnel that she did not know what caused the Child's injury and that Appellee did not respond to her text asking about the cause. While there is a note in UPMC's records that Appellant may have mentioned possible "strangulation," this is not odd considering she had earlier been advised that the marks resembled "ligature marks." (Trial Tr., p. 87.) There is nothing misleading about this statement and it accurately described Appellant's knowledge regarding a question certain to be asked by medical providers. The sole evidence at trial on the issue of child abuse was that Appellant did state she believed

Appellee was abusive to her during their marriage, but only in response to a specific question asked by only one of the medical providers. She testified that she clarified this abuse was not physical.

{¶60} In paragraph thirty of the judgment entry, the court relied on an incident where Appellee was upset that Appellant posted a photograph of the Child and her older son in the bathtub covered with bubbles. The court stated that Appellee "told her to pull it off the site, [and] she minimized his concerns. At hearing [Appellee] explained his concerns as to how such pictures can be used by others for nefarious purposes. Instead of acknowledging that maybe she just had not thought of that, she maligned [Appellee]." (9/20/21 J.E., ¶ 30.)

{¶61} Again, this incident is completely irrelevant to the issue in this case. Even so, contrary to the court's description of the event, Appellee testified at the hearing that he did not discuss the bathtub photograph with Appellant. It is obvious that he could not have asked her to delete it from her social media. He did not make such a request at the hearing. In testimony as to this matter at the custody hearing, when asked if he communicated his concerns to Appellant he testified that he did not because he believed that it would only spur an argument. Appellant's counsel addressed Appellee's failure to raise the issue with her:

> Q Okay. If you are not concerned enough to report [the photograph to Appellant], what was the purpose of bringing it to the Court's attention today?
>
> A To show that it's questionable behavior.

(Trial Tr., p. 344.) It is clear from this testimony Appellee was attempting in some fashion to bolster his claim of a change in circumstance. It is equally clear this attempt should have failed, since the event was irrelevant and certainly did not support any change in circumstance.

**{¶62}** In addition, the court considered its personal knowledge of Appellant's former employment as a news reporter and current employment at a hospital, construing this to decide that her employment history provided Appellant with the knowledge and connections to orchestrate false abuse claims against Appellee. "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Evid.R. 201(B). "A judge may not take judicial notice of facts just because the judge has personal knowledge of a fact." *Staffrey v. Smith*, 7th Dist. Mahoning No. 09-MA-107, 2010-Ohio-1296, ¶ 38.

**{¶63}** Reviewing this record, the discussion of Appellant's employment history is irrelevant and speculative. There is nothing within the record to suggest that Appellant specifically covered abuse cases in her work as a news reporter. Even if she had, it is a stretch to assume that this somehow provided her the knowledge or ability to orchestrate a false abuse claim. We must note that this is particularly true when considering the court properly ignored the fact that Appellee's current employment as a police officer could also be said to raise certain speculation in this matter.

**{¶64}** In addition, the trial court considered Appellant's employment in a hospital setting. However, Appellant works in human relations and there is nothing within the

record to suggest that she has any interaction in the medical treatment aspect of a hospital. Any suggestion that she gleaned certain specific knowledge to cause her to falsely imply abuse is complete speculation. Regardless, there is no evidence to suggest that Appellant did anything other than follow medical advice in seeking treatment for the Child.

{¶65} We again state the obvious: the parties do not get along. While many, many instances of disagreement between the parties were raised and discussed at hearing in this matter, almost all of this testimony is irrelevant to the sole issue regarding whether the incident that occurred on March 16, 2020 amounted to a change in circumstance. Clearly the animosity which exists is not any kind of change in circumstance in this case.

{¶66} In reviewing only the relevant evidence as to whether the incident beginning March 16, 2020 constituted a change in circumstance for child custody purposes, this record reflects that it did not. The Child was returned to Appellant from Appellee's family with a visible injury and in an unclean state. No explanation for the unusual appearance of the marks on this very young child was given, though it was sought. It was completely consistent with the parties' past dealings that they failed to communicate and cooperate. On review of the evidence, particularly the photograph of the Child's injury and condition, the record reflects it was more than reasonable for a parent to seek medical treatment where the cause of that injury is unknown. While Appellee downplayed the injury as a "mere scratch," the photographs admitted as evidence could suggest otherwise. Following examination, it became known that the injury was not serious, but there was no way for Appellant to know this at the time she sought medical treatment. Each of

Appellant's actions regarding the injury and the accompanying medical treatment appears to be reasonable and based on medical advice, on which she reasonably relied and followed. Unfortunately, because the parties do not cooperate the situation became more complicated than necessary and ultimately involved an investigation by child welfare authorities. While the trial court clearly believed this was Appellant's goal, there is no evidence that this was Appellant's plan or intent, despite the conjecture in the record on which the trial court relied. Even if the trial court found one of the treating doctor's testimony incredible, there is no evidence of record that Appellant should not have relied on his advice. Most importantly, nothing in regard to the evidence surrounding this incident reveals any change in the circumstances of these parties or their dealings with one another regarding parenting. And again, this incident provided the sole basis for Appellee's motion seeking reallocation of parental rights.

{¶67} We reiterate that the consensus opinion of all professional testimony is that the current arrangement of the parties having essentially equal parenting time should remain. Appellant should remain as the custodial parent absent a change in circumstance, which has not occurred. Hence, there is no need to address the best interests of the Child. However, we remind the parties that at the heart of every custody case is a consideration of a child's best interests. While we understand and appreciate how difficult matters involving parenting issues may be, continued contentious behavior never serves any child's best interests.

{¶68} Based on the foregoing, Appellant's first and second assignments of error have merit and are sustained.

Case No. 21 JE 0026

Conclusion

**{¶69}** Appellant argues that each of the professional witnesses at the hearing opined that the custody arrangement should not change based on the sole incident at issue. Appellant also argues that the court improperly relied on outside knowledge that was not presented at trial when rendering its decision in this matter. For the reasons provided, Appellant's arguments have merit and the judgment of the trial court is reversed and judgment is entered in favor of Appellant.

Donofrio, P.J., concurs.

D'Apolito, J., concurs.

---

For the reasons stated in the Opinion rendered herein, the assignments of error are sustained and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Jefferson County, Ohio, is reversed. Judgment is hereby entered in favor of Appellant. Costs to be taxed against the Appellee.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**